******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOSEPH
A. STEPHENSON
(AC 40250)

Sheldon, Bright and Mihalakos, Js.

*Syllabus*

Convicted of the crimes of burglary in the third degree, attempt to commit
tampering with physical evidence and attempt to commit arson in the
second degree in connection with a break-in at a courthouse, the defen-
dant appealed to this court. The defendant had two felony charges
pending against him and was scheduled to commence jury selection in
a trial of those pending charges. Two days before the start of jury
selection, a silent alarm was triggered at the courthouse at approximately
11:00 p.m. Upon arrival, the state police discovered, inter alia, a broken
window in an interior state's attorney's office, a black duffel bag with
six unopened canisters of industrial strength kerosene on the floor of
a state's attorney's office and several case files lying in a disorganized
pile on the floor near a secretary's desk area. The defendant claimed,
inter alia, that the evidence presented at trial was insufficient to support
his conviction of each offense as charged by the state, which alleged,
as a common essential element of each charge, that the defendant had
entered the courthouse with the intent to commit the crime of tampering
with physical evidence therein so as to impair the availability of his
case files for use against him in the prosecution of the pending felony
charges. *Held* that the evidence was insufficient to support the defen-
dant's conviction of the charged offenses; although there was physical
evidence that directly linked the defendant to the bag containing the
kerosene, which supported an inference that the defendant dropped the
bag where the police found it, there was no such evidence that placed
the defendant in the office where the files were located, as the state
presented no evidence at all from which the jury reasonably could have
inferred that the defendant entered the courthouse through the broken
window of the interior office and went to a filing cabinet in another
office and removed the files found on the floor, and although the state
argued that the defendant's intent to tamper with physical evidence,
necessary to prove him guilty of each charged offense, could be inferred
from his handling of the files, the evidence presented, which did not
include the names of the disorganized case files or where those files
had been stored in the office before the intruder entered, show that the
intruder had touched, altered, destroyed, concealed or removed any of
the case files, or address any reason why the defendant might have
wanted to tamper with his case files, showed only that the defendant
entered the courthouse through the broken window, walked through
the office, and dropped the duffel bag on the floor; accordingly, in the
absence of any evidence that the defendant ever touched case files in
the state's attorney's office, or that he did so with the intent to tamper
with such files or their contents, the jury reasonably could not have
inferred that the defendant had that intent, as required to prove him
guilty of each of the three offenses of which he was convicted, and,
thus, his conviction could not stand.

Argued September 11, 2018—officially released January 8, 2019

*Procedural History*

Substitute information charging the defendant with
the crimes of burglary in the third degree, attempt to
commit tampering with physical evidence, and attempt
to commit arson in the second degree, brought to the
Superior Court in the judicial district of Stamford-Nor-
walk and tried to the jury before *White, J.*; verdict and
judgment of guilty, from which the defendant appealed
to this court. *Reversed*; *judgment directed.*

*Vishal K. Garg*, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Michelle Manning*, assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Joseph A. Stephenson, appeals from the judgment of conviction rendered against him after a jury trial in the Stamford Superior Court on charges of burglary in the third degree in violation of General Statutes § 53a-103, attempt to commit tampering with physical evidence in violation of General Statutes §§ 53a-49 (a) (2) and (Rev. to 2013) 53a-155 (a) (1),[1] and attempt to commit arson in the second degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-112 (a) (1) (B). The defendant claims on appeal that (1) the evidence presented at trial was insufficient to support his conviction on those charges, and thus that he is entitled to the reversal of his conviction and the entry of a judgment of acquittal on each such charge, and (2) the court improperly prevented him from presenting exculpatory testimony from his trial attorney as to a conversation between them two days before his alleged commission of the charged offenses that tended to contradict the state's claim that he had a special motive for committing those offenses. We agree with the defendant that the evidence presented at trial was insufficient to convict him of any of the charged offenses, as the state charged and sought to prove them in this case, and, thus, we conclude that his conviction on those charges must be reversed and this case must be remanded with direction to render a judgment of acquittal thereon. In light of this conclusion, we need not address the defendant's second claim.

The following procedural history and evidence, as presented at trial, are relevant to our resolution of the defendant's claims. On Sunday, March 3, 2013, at approximately 11:00 p.m., the silent alarm at the Norwalk Superior Courthouse was triggered by the breaking of a window in the state's attorney's office on the east side of the courthouse.[2] Soon thereafter, Connecticut State Trooper Justin Lund arrived at the courthouse, followed almost immediately by Troopers Darrell Tetreault and Alex Pearston. Upon Tetreault's arrival, he saw Lund standing "right against the building, at the window, with his firearm deployed yelling at somebody in the building." Because, however, Lund was later injured and could not testify at the defendant's trial, no evidence was presented as to what, if anything, he saw or heard through the broken courthouse window at that time.

The troopers promptly established a perimeter around the outside of the courthouse and radioed for the assistance of a canine unit. When a canine unit arrived several minutes later, the troopers followed it inside the courthouse, which they promptly searched for intruders, without success.

The searching officers determined that the broken window was located in an interior office on the east

side of the state's attorney's office, which was shared by two assistant state's attorneys, each of whom kept a desk and certain personal effects in the office. Photos of the interior office taken after the break-in showed that a set of blinds that had been hanging in the window through which the intruder entered the building were bent and broken, but still hanging where they were when the intruder came in through them.

Inside the larger state's attorney's office, the troopers found a black duffel bag on the floor near the south end of the corridor running past the doors of the three interior offices on the east side of the larger office, including the middle office where the intruder had broken the window and entered the building. The bag thus lay to the far left of a person entering the larger office through the door of the interior office with the broken window. Inside the duffel bag were six unopened blue canisters of industrial strength kerosene with their tags and UPC strips cut off. The officers swabbed the bag and the six canisters of kerosene for DNA.

Meanwhile, in the "secretary's desk area" in the northwest corner of the larger state's attorney's office, across the room from and to the right of a person entering the larger office from the interior office with the broken window, the troopers found several case files lying in a disorganized pile on the floor, where they appeared to have been dumped, dropped or knocked over. The secretary's desk area contained two adjacent desks on which telephones, computer monitors, other case files, assorted office equipment and personal memorabilia were arrayed. The desk further to the north, in front of which the pile of files was found, had two partially open drawers on its left side, above which other case files were loosely stacked. To the left of and behind the chair of a person sitting at that desk were two large lateral file cabinets with case files densely packed on open shelves inside them. No evidence was presented as to which case files were found either in the disorganized pile on the floor or in the loose stack on the adjacent desk. Nor, because those case files were never identified, was there any evidence as to where such files had been stored in the office before the intruder entered or whether, if the intruder had moved such files to where they were found from another location in the office, the intruder had touched or disturbed anything in any such location in such a way as to shed light on the object or purpose of his search. None of the case files or any other objects in any locations where they were stored before or found after the break-in was dusted for fingerprints or swabbed for DNA.

The troopers also recovered a ball-peen hammer from the vestibule area just inside an exterior door to the courthouse, marked "employee entrance only," through which it was later determined that the intruder fled

from the courthouse after the troopers arrived, and began to search inside it. The troopers also swabbed the hammer for DNA.

During their ensuing investigation, police investigators obtained and reviewed surveillance videos of the outside of the courthouse, which had been taken on the evening of the break-in by cameras installed on the courthouse itself and in a beauty salon to the east of the courthouse. Video footage obtained from those cameras included a sequence in which an "individual . . . dressed all in black, [who] appeared to have a black mask on, [a] black jacket, [and] black pants, and appeared to be carrying a black or dark colored bag . . . approached the side of the courthouse, which is the side that the window was broken on, the side adjacent to the beauty salon." It also included, in the hour before the foregoing sequence was recorded, several other sequences in which a suspicious vehicle—a light colored SUV with a defective rear brake light and a roof rack on the top, a brush bar on the front, and a tire mounted on the back—could be seen driving slowly past the front of the courthouse and driving in and out of the courthouse parking lot. Finally, it included a short sequence, filmed shortly after the troopers entered the courthouse, in which a person dressed all in black emerged from the east side door of the courthouse and ran away across the parking lot where the suspicious vehicle had been seen before the break-in.

The troopers later identified the make, model and vintage of the suspicious vehicle seen in the surveillance videos as a Land Rover Freelander manufactured between the years 2002 and 2005. They subsequently determined that the database of the Connecticut Department of Motor Vehicles listed 167 registered vehicles that matched the suspicious vehicle's description. Later, upon narrowing their search to matching vehicles registered to persons living in the Norwalk and Stamford areas, investigators learned that one such vehicle, a 2002 Land Rover Freelander, was registered to Chuck Morrell, the defendant's stepfather. When Morrell was interviewed by the police, he informed them that he had purchased the vehicle for his wife, the defendant's mother, in 2012, and that both the defendant and his mother used the vehicle and were listed as insureds on his automobile insurance policy. When police investigators finally examined Morrell's vehicle several weeks after the break-in, they found that it closely matched the suspicious vehicle seen in the surveillance videos because it not only had aftermarket equipment of the sorts installed on the suspicious vehicle, but it had a defective rear brake light.

In addition to the previously described information, police investigators developed the following additional information concerning the defendant's possible involvement in the courthouse break-in. On March 4,

2013, the day after the break-in, the defendant called the Norwalk public defenders' office to ask if the courthouse would be open that day. The defendant was then scheduled to commence jury selection in the trial of two felony charges then pending against him in Norwalk the following day. The window that had been broken and used to gain access to the courthouse on March 3, 2013, was located in the office of the assistant state's attorney who was responsible for prosecuting the defendant in his upcoming trial.

The state also presented evidence that the defendant, while incarcerated in April, 2013, made certain recorded phone calls to his brother Christopher Stephenson, and his mother, in which he discussed the March 3, 2013 break-in. In particular, the defendant's brother told the defendant in one such phone call that Morrell "must have" told the police about the defendant's use of the Freelander on the evening of the break-in and the defendant stated that the police "must have" seen the vehicle at the courthouse on that evening. The defendant urged his brother to say that he had been in New York at the time of the break-in, and thereafter urged both his brother and his mother not to discuss anything about the break-in with the police.

Finally, upon testing the DNA swabs taken from the physical evidence discarded by the intruder at the courthouse on the evening of March 3, 2013, personnel from the Connecticut Forensic Science Laboratory determined that each swab contained a mixture of DNA from at least two persons, and that the defendant could not be eliminated as a possible contributor to any such mixture.

In his own defense, the defendant presented testimony from his brother that they were together in New York on the evening of the break-in. In addition, he attempted unsuccessfully to present testimony from his attorney as to a conversation between them on the Friday before the break-in, in which he had voiced his intention to plead guilty to the charges then pending against him in Norwalk rather than to go to trial the following Tuesday. The trial court sustained the state's objection to such testimony on the ground that it was inadmissible hearsay.

On the basis of the foregoing evidence, the state urged the jury to find the defendant guilty of all three offenses with which he was charged: burglary in the third degree in violation of § 53a-103; attempt to commit tampering with physical evidence in violation of §§ 53a-49 (a) (2) and 53a-155 (a) (1); and attempt to commit arson in the second degree in violation of §§ 53a-49 (a) (2) and 53a-112 (a) (1) (B).[3] The state attempted to prove its case against the defendant under the following, closely intertwined theories of factual and legal liability.

As to the charge of burglary in the third degree, the

state claimed that the defendant had entered or remained unlawfully in the courthouse, when it was closed to the public and he had no license or privilege to be there for any lawful purpose, with the intent to commit the crime of tampering with physical evidence therein. Although the state conceded that the defendant had not completed the crime of tampering with physical evidence while he was inside the courthouse, it nonetheless claimed that he had intended to commit that offense within the courthouse by engaging in conduct constituting an attempt to commit that offense therein. On that score, the state further argued that the defendant had broken into the courthouse through the window of the assistant state's attorney who was prosecuting him on two pending felony charges, entered the larger state's attorney's office and gone directly to the file cabinets where the state stored its case files, and in the short time he had there before the state police arrived in response to the silent alarm, begun to rummage through the state's case files in an effort to find and tamper with the contents of his own case files. Claiming that the defendant was desperate to avoid his impending trial, the state argued that the defendant thereby attempted to tamper with his case file by altering, destroying, concealing or removing its contents, and thus to impair the verity or availability of such materials for use against him in his upcoming trial. Finally, as to the charge of attempt to commit arson in the second degree, the state claimed that the defendant had committed that offense by breaking into the Norwalk courthouse as aforesaid, while carrying a duffel bag containing six canisters of industrial strength kerosene, and thereby intentionally taking a substantial step in a course of conduct planned to culminate in the commission of arson in the second degree by starting a fire inside the courthouse, with the intent to destroy or damage the courthouse building, for the purpose of concealing his planned crime of tampering with physical evidence, as described previously.

The state expressly disclaimed any intent to prosecute the defendant for tampering with physical evidence on the theory that he attempted to start a fire inside the courthouse in order to damage or destroy the building, and thus to damage or destroy the contents of his case files or their contents by fire. Instead, it claimed that the defendant planned to start a fire in the courthouse in order to conceal his earlier crime of tampering with physical evidence. Similarly, the state did not allege or seek to prove that the defendant had committed burglary in the third degree by entering or remaining unlawfully in the courthouse with the intent to commit arson in the second degree therein.

Following a jury trial in which the jury was specifically instructed on the charged offenses under the previously-described theories of liability, the defendant was found guilty on all three charges. He later was

sentenced on those charges to a total effective sentence of twelve years incarceration followed by eight years of special parole. This appeal followed.

The defendant first claims that the evidence presented at trial was insufficient to support his conviction of any of the three offenses of which his jury found him guilty because such evidence failed to prove a single common essential element of those offenses, as the state charged and sought to prove them in this case, beyond a reasonable doubt. That common essential element was that, upon entering the Norwalk Superior courthouse on March 3, 2013, the defendant's intent was to tamper with physical evidence. In making this claim, the defendant does not challenge the sufficiency of the state's evidence to prove that he was the intruder who broke into the courthouse on the evening of March 3, 2013. Rather, he claims that neither his proven conduct on that evening, nor any of his words or actions thereafter, afforded the jury any nonspeculative basis for inferring that his intent, upon entering the courthouse on that evening, was to commit the crime of tampering with physical evidence therein.[4]

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we *determine* whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Emphasis added; internal quotation marks omitted.) *State* v. *Perez*, 147 Conn. App. 53, 64–65, 80 A.3d 103 (2013), aff'd, 322 Conn. 118, 139 A.3d 654 (2016). It is axiomatic, however, that in evaluating the sufficiency of the evidence to support a criminal conviction, the only theory of liability upon which the conviction can be sustained is that upon which the case was actually tried, in the sense that it was not only charged in the information, but it was argued by the state and instructed upon by the court. *State* v. *Carter*, 317 Conn. 845, 853–54, 120 A.3d 1229 (2015).

As a threshold matter, we note that the defendant is correct in asserting that a common essential element of his conviction of all three charges here challenged is that, upon entering the Norwalk Superior courthouse on the evening of March 3, 2013, he had the intent to commit the crime of tampering with physical evidence therein. All three counts of the amended long form

information on which he was brought to trial so alleged,[5] the state's attorney so argued in his closing arguments,[6] and the court so instructed the jury in its final instructions on the law.[7] Accordingly, the state does not dispute this aspect of the defendant's evidentiary sufficiency claims on appeal. Therefore, our sole focus in resolving those claims must be on whether the evidence presented at trial, construed in the light most favorable to sustaining the challenged conviction, was sufficient to prove beyond a reasonable doubt that, when the defendant entered the courthouse on the evening of March 3, 2013, he did so with the intent to commit the offense of tampering with physical evidence therein by some means other than setting fire to the building.[8]

General Statutes § 53a-3 (11) provides that "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." Section 53a-155 (a) (1), in turn, provides in relevant part: "A person is guilty of tampering with . . . physical evidence if, believing that an official proceeding is pending . . . he . . . [a]lters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such [official] proceeding . . . ."[9] Under the foregoing provisions, a person acts with the intent to commit tampering with physical evidence when, believing that an official proceeding is pending, he engages in conduct with the conscious objective of altering, destroying, concealing or removing any record, document or thing in order to impair its verity or availability for use in that official proceeding. Here, more particularly, the state claimed and sought to prove that the defendant acted with that intent by breaking into the Norwalk Superior courthouse, where he was about to start trial in two pending felony cases, in order to alter, destroy, conceal or remove his case files in those cases or their contents, and thereby impair the verity or availability of such materials for use against him in those prosecutions.

"Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . Moreover, the [jury is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent. . . . Intent may be and usually is inferred from conduct. Of necessity, it must be proved by the statement or acts of the person whose act is being scrutinized and ordinarily it can only be proved by circumstantial evidence." (Internal quotation marks omitted.) *State* v. *O'Donnell*, 174 Conn. App. 675, 687–88, 166 A.3d 646, cert. denied, 327 Conn. 956, 172 A.3d 205 (2017). "The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory,

inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Lamantia*, 181 Conn. App. 648, 665, 187 A.3d 513, cert. granted, 330 Conn. 919,      A.3d (2018).

The defendant does not dispute that two felony prosecutions, both official proceedings, were pending against him in the Norwalk Superior Court when he allegedly broke into the Norwalk Superior courthouse on the evening of March 3, 2013, or that he lacked knowledge of the pendency of those official proceedings, in which trial was scheduled to begin two days later. Nor, to reiterate, does he argue that the evidence presented at trial was insufficient to prove that he was the intruder who broke into the courthouse on that evening. Instead, he claims that such evidence was insufficient to prove that he then acted with the intent to tamper with physical evidence within the courthouse because the state failed to establish any connection between his proven conduct within the courthouse and any of the files or materials with which he is claimed to have had the intent to tamper. We agree.

Here, the state claims that, on the evening of March 3, 2013, the defendant broke a window in the state's attorney's office at the courthouse, climbed through that window into the office of the assistant state's attorney who was then prosecuting him on two felony charges, walked through that office into the larger state's attorney's office where he dropped a duffel bag containing kerosene at the end of the corridor running past it to his left, then "walked all the way around to the [state's attorneys'] case files" on the other side of the larger office, where he "pull[ed] [the] files down onto the floor and [went] through them." The state further argued to the jury such evidence showed that the defendant's intent was to tamper with his own case files or their contents before lighting the building on fire because he did not ignite one of the bottles of kerosene and throw it through the broken window, or start a fire immediately upon entering the building. Instead, the state argued, "[the] [f]irst thing he did was drop that bag of kerosene in the hall outside the office, walk all the way around the wall past the secretary's desk and over to the corner where the criminal files were kept and he started going through them." On that basis, the state claims that the defendant intended to alter, destroy, conceal or remove either his own case files or something contained within them, then to start a fire within the office to conceal his act of tampering.

The state concedes that no witness saw the defendant engage in any of these acts. Furthermore, although there is physical evidence that directly links the defendant to the bag containing the kerosene, supporting a reasonable inference that the defendant dropped the bag where the police found it, there is no such evidence

that puts the defendant in the office where the files were located. Instead, the state argued that the jury could infer that the defendant entered the office, proceeded to the secretary area where the files were located, started to go through them and did so with the intent of tampering with evidence all from the single fact that there was a disorganized pile of files on the floor. We conclude that this single fact was insufficient for the jury to infer that the defendant ever touched any case files in the state's attorney's office on March 3, 2013, let alone pulled case files out of any file cabinet or off any desk, shelf or table, or that he went through such files for any purpose, much less that he took any steps to alter, remove, conceal or destroy the files or their contents as or after he went through them. This is true for four fundamental reasons. To reiterate, no witness saw or heard the intruder doing anything while he was inside the state's attorney's office or any other part of the courthouse. The only person who may possibly have seen or heard the intruder in that time frame was Trooper Lund, who was seen standing by the broken window, and heard yelling at someone inside the building when the other troopers arrived. Lund, however, did not testify because he had been injured in another incident before trial began, and no other witness reported seeing or hearing anyone doing anything inside the building during the break-in. Without such direct testimony, the state was left to prove its claim by circumstantial evidence based upon the intruder's proven conduct during the break-in and thereafter.

Second, although the state expressly theorized that the intruder, upon entering the larger state's attorney's office, dropped his duffel bag of kerosene down a hallway to his left, then circled all the way around the office to his right, where he pulled case files out of lateral file cabinets in that area and rummaged through them, assertedly for the purpose of finding his own case files and tampering with them or their contents, before dumping the pulled out case files in a disorganized pile on the floor, it failed to establish that the intruder ever touched those or any other case files in the office during the break-in. To begin with, no evidence was presented that the files on the floor were not exactly where police investigators found them when the state's attorney's office last closed before the break-in. Although the supervising state's attorney testified that her colleagues generally kept their case files in orderly fashion in the lateral file cabinets in the secretary's desk area, she did not state that they always did so. In fact she testified that they did not always do so, for they sometimes kept their own files with them, particularly when they were preparing cases for trial. This testimony was confirmed by photographic evidence showing piles of case files lying elsewhere in the office, undermining the state's unsupported contention that the files in the pile on the floor must have been pulled out of the lateral file

cabinets and left there by the intruder. Indeed, such photos also showed that the lateral file cabinets were so densely packed with case files, without apparent gaps or irregularities, as to make it unlikely that the large number of files on the floor had been indiscriminately pulled out of there during the break-in.

Third, no list or inventory was ever made of the files on the floor. Therefore, not only was there no evidence that the defendant's case files were among the files found on the floor, but there was no evidence as to where in the office any such files had been stored before the break-in. Armed with such information, the state might reasonably have claimed that the intruder gained access to the files during the break-in and moved them to where the police later found them on the floor. It might also have been able to argue, from the names or numbers on the files or the places where the intruder had searched for and found them, that by selecting files in that manner, the intruder had given evidence as to his purpose in so doing. If, for example, the selected files were in an alphabetical sequence that included the defendant's name, or in a numerical sequence that included the date of the defendant's upcoming trial, such a selection might have supported the inference that the intruder was searching for the defendant's file. Similarly, if he had selected files that were stored in the office of the assistant state's attorney who was prosecuting his cases, such a selection might have supported the inference that he was searching for the defendant's files. In that event, the state might have further supported its claim by lifting fingerprints from or taking DNA swabs of the places where the selected files had been stored or the files themselves. Without an inventory of the files found on the floor, however, no such logical inference could be argued and no supporting forensic evidence was sought or presented.

Fourth and finally, there is no evidence that the defendant's purpose in going through any case files, if in fact he did so, was to alter, destroy, conceal or remove them or their contents from the state's attorney's office. No evidence was presented that any case file was altered, destroyed, concealed or removed in any way. Nor was evidence presented as to the contents of the case files in the defendant's two pending cases, or of any reason why the defendant might have found it in his interest to tamper with them prior to his trial. Indeed, although the supervising state's attorney testified as to the types of materials that case files often contain, including physical evidence and witness statements, neither she nor any other witness offered evidence as to the contents of the defendant's pending case files, or advanced any reason why the defendant might have believed that it was in his interest to compromise their verity or availability to the state in advance of his impending trial. Nor could the jury have drawn an inference as to the defendant's motive to tamper with his case files

from the nature of his pending charges, for those charges were never listed for the jury.

In conclusion, the state presented no evidence at all from which the jury reasonably could have inferred that, during the short period of time between the intruder's breaking of the window and the arrival of the state police on the scene, the defendant entered the building through that window and went directly to the filing cabinet in another office and removed the files that were later discovered on the floor. Although the state argued that the defendant's intent to tamper with physical evidence could be inferred from his "handl[ing]" of those files, the evidence presented showed only that the defendant entered the courthouse through the window of the office of two assistant state's attorneys, walked through that office and dropped the duffel bag containing the six bottles of kerosene onto the floor in the corridor running past that office, to the far left of the door leading into the larger state's attorney's office.

In the absence of any evidence that the defendant ever touched case files in the state's attorney's office, much less that he did so with the intent to tamper with such files or their contents, the jury reasonably could not have inferred that the defendant had that intent, as required to prove him guilty of each of the three offenses of which he was convicted. Accordingly, his conviction cannot stand.[10]

The defendant also claims, as previously noted, that the court improperly prevented him from presenting exculpatory testimony from his trial attorney as to a conversation between them two days before his alleged commission of the charged offenses that tended to contradict the state's claim that he had a special motive for committing those offenses. Because we reverse his conviction for the reasons stated previously, we need not address this claim.

The judgment is reversed and the case is remanded with direction to render judgment of acquittal on all three charges against the defendant.

In this opinion the other judges concurred.

[1] All references in this opinion to § 53a-155 (a) (1) are to the 2013 revision.

[2] Although the state's exhibit 36, which is a diagram of the Norwalk Superior courthouse, bears a notation indicating that the window that was broken was on the north side of the building, all of the other evidence at trial indicates that it was, in fact, located on the east side of the building. We therefore construe the notation on exhibit 36 as an error.

[3] The defendant initially was charged with criminal mischief in the first degree in violation of General Statues § 53a-115, rather than attempted tampering with physical evidence.

[4] The defendant also argues that, in order to convict him of attempting to tamper with physical evidence, the state was required to prove beyond a reasonable doubt that the documents or materials he attempted to tamper with qualified as "physical evidence" within the meaning of General Statutes § 53a-146 (8), in that they constituted "any article, object, document, record, or other thing of physical substance which is or is about to be produced or used as evidence in an official proceeding." General Statutes § 53a-146 (8). Because we reverse the defendant's conviction on the ground that the state failed to prove that the defendant intended to tamper with the case

files and/or their contents with which he is claimed to have attempted to tamper, we need not address his claim that the state failed to prove that such case files and their contents did not qualify as physical evidence under § 53a-146 (8).

[5] In its amended long form information dated September 30, 2016, the state charged the defendant as follows:

"[The] State's Attorney for the Judicial District of Stamford-Norwalk accuses Joseph Stephenson of the crime of burglary in the third degree and charges that in the city of Norwalk, on or about the [third] day of March, 2013, the said defendant . . . did enter and remain unlawfully in a building *with intent to commit the crime of tampering with physical evidence, in violation of . . . [§§] 53a-103 and 53a-155 (a) (1). . . .*

"And said state's attorney further accuses the defendant . . . of the crime of attempted tampering with physical evidence, and alleges that, acting with the belief that an official proceeding is pending and about to be instituted, *did an act, which under the circumstances as he believed them to be, was an act which constituted a substantial step in a course of conduct planned to culminate in his commission of the crime of tampering with evidence in violation of . . . [§§] 53a-155 (a) (1) and 53a-49 (a) (2). . . .*

"And said state's attorney further accuses the defendant . . . with the crime of attempt at arson in the second degree and alleges that in the city of Norwalk on or about the [third] day of March 2013, the said defendant . . . with intent to destroy and damage a building, did an act, which under the circumstances as he believed them to be, was an act which constituted a substantial step in a course of conduct planned to culminate in starting a fire and such fire was intended *to conceal the crime of tampering with physical evidence in violation of . . . [§§] 53a-112 (a) (1) (B), 53a-49 (a) (2), and 53a-155 (a) (1)*." (Emphasis added.)

[6] In its closing argument to the jury, the state argued specifically, inter alia, that the evidence "clearly show[ed] . . . what [the defendant's] motive, and *what his intentions were, and what that plan really was there to do and that was to tamper with the files, to get to his case or any case, and hinder the prosecution, the prosecution that was going to start in two days*." (Emphasis added.)

[7] The court instructed the jury, inter alia, that to find the defendant guilty of burglary in the third degree, "the state must prove beyond a reasonable doubt that, one, the defendant unlawfully entered a building and, two, that *he intended to commit a crime therein, to wit, tampering with physical evidence*." (Emphasis added.)

The court also instructed the jury that: "A person is guilty of arson in the second degree when, with intent to destroy or damage a building, he starts a fire . . . and *such fire was intended to conceal some other criminal act, to wit, the crime of tampering with physical evidence*." (Emphasis added.)

[8] As stated herein, the state expressly disavowed any contention that the defendant intended to tamper with evidence by setting it on fire, and consistently argued that the defendant intended to tamper with physical evidence and then to conceal his act of tampering by setting the building on fire.

[9] Section 53a-155 was amended in 2015 to add that one may be guilty of tampering during a criminal investigation or when a criminal proceeding is about to commence.

[10] The state has not argued that the defendant should be convicted of any lesser included offenses in the event that we determine that the evidence was insufficient to sustain his conviction. Accordingly, we have no occasion to so order. See *State* v. *Jahsim T.*, 165 Conn. App. 534, 541, 139 A.3d 816 (2016).