******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOSEPH STEPHENSON *v.* COMMISSIONER
OF CORRECTION
(AC 45482)

Elgo, Suarez and Bear, Js.

*Syllabus*

The petitioner, who had been convicted, on pleas of guilty, of two counts
of larceny in the sixth degree, sought a writ of habeas corpus, claiming
that his trial counsel, L, had provided ineffective assistance by failing
to properly advise him about the immigration consequences of his pleas.
The petitioner, who was a citizen of Jamaica and a lawful permanent
resident of the United States, was sentenced to two concurrent 364 day
terms of incarceration, which L negotiated in an effort to alleviate
adverse immigration consequences to the petitioner. A federal immigra-
tion judge, however, charged the petitioner as removable and ordered
that he be removed from the United States. The habeas court subse-
quently rendered judgment granting the habeas petition, concluding that
L had provided ineffective assistance by failing to properly advise the
petitioner about the mandatory deportation consequence of his guilty
pleas to two crimes of moral turpitude, irrespective of the sentence
imposed. The court further determined that, but for that deficient advice,
the petitioner would not have pleaded guilty and that he would have
proceeded to trial. On the granting of certification to appeal, the respon-
dent, the Commissioner of Correction, appealed to this court, claiming,
inter alia, that the court failed to make findings, pursuant to *Budziszew-
ski* v. *Commissioner of Correction* (322 Conn. 504), as to what advice
L actually provided, and then determine whether the petitioner met his
burden to prove that counsel's advice failed to convey the information
required under *Padilla* v. *Kentucky* (559 U.S. 356). *Held*:

1. The respondent could not prevail on his claim that the habeas court
incorrectly determined that L had performed deficiently because the
court did not determine what advice L actually provided, as required
by *Budziszewski*: although the respondent emphasized the court's state-
ment that the details of one conversation between the petitioner and L
were unclear, the respondent ignored the court's numerous other find-
ings, including that L inaccurately advised the petitioner that sentences
of less than one year would protect the petitioner from immigration
consequences; moreover, R, an attorney specializing in immigration law,
testified that the petitioner's convictions in two cases for crimes of
moral turpitude that did not arise out of the same scheme of conduct
rendered the petitioner deportable, and the court found that the auto-
matic deportation consequences resulting from the petitioner's guilty
pleas were readily apparent and that the applicable federal immigration
law (8 U.S.C. § 1227 (a) (2) (A) (ii) (2012)) was succinct and straightfor-
ward, which was supported by R's testimony; furthermore, this court
was not persuaded that the habeas court's decision failed to comply with
*Budziszewski*, as the court discussed in its memorandum of decision
its findings of fact as to the discussions between the petitioner and L
and what transpired before the petitioner entered his guilty pleas, and
its determination that L performed deficiently was based on its finding
that L inaccurately advised the petitioner regarding the immigration
consequences of his guilty pleas due to L's misunderstanding that the
length of the petitioner's sentences would have impacted whether depor-
tation proceedings would be instituted against him.

2. The respondent could not prevail on his claim that, as a consequence of
the habeas court's failure to make the requisite findings under *Budzis-
zewski*, it failed to hold the petitioner to his burden to rebut the presump-
tion that L's advice fell within the wide range of reasonable professional
assistance: the court specifically found that L had discussed with the
petitioner the difference between one and two convictions for crimes
involving moral turpitude, and, although it did not set forth the specific
advice given, as it was unclear from the record, that court also deter-
mined that L had incorrectly advised the petitioner regarding the immi-
gration consequences of his guilty pleas, thus necessarily determining

that either the presumption of reasonable professional assistance had been rebutted or that it did not apply, and, even though it was unclear what L told the petitioner during that one conversation, the record reflected that L did not know and, therefore, failed to advise the petitioner that, by pleading guilty to two crimes of moral turpitude that did not arise out of a single scheme of criminal conduct, he was automatically subject to deportation; moreover, nothing in the record suggested that the court construed the lack of clarity in that one conversation against the respondent, rather, the court's determination that L performed deficiently was based on its finding, which was amply supported by the record, that L inaccurately advised the petitioner that a sentence of less than one year for each of his convictions could help protect the petitioner from deportation; furthermore, the fact that L had consulted with an expert on immigration law did not excuse L's failure to advise the petitioner accurately regarding the consequences of his guilty pleas, as required under *Padilla*, as this court was not aware of any exception to the requirement set forth in *Padilla* for such situations, and the petitioner was entitled under the sixth amendment to the United States constitution to be informed accurately of the immigration consequences of his guilty pleas.

3. Contrary to the respondent's claim, the habeas court did not apply a higher standard than what the law required when it based its finding of deficient performance on L's failure to advise the petitioner that his pleas would automatically subject him to mandatory deportation: the immigration consequences under federal law clearly mandated deportation, and, this court, having reviewed the habeas court's memorandum of decision as a whole, was not persuaded that the habeas court deviated from the standard set forth in *Padilla* and *Budziszewski* by requiring the use of specific words or phrases, rather, the habeas court focused more broadly on whether L correctly conveyed to the petitioner the mandatory deportation consequences of the guilty pleas under federal law when he undercut the certainty of that result with clearly erroneous advice suggesting that deportation might be avoidable, and, to the extent that L gave advice casting doubt on the likelihood that federal authorities would actually apprehend and deport the petitioner despite the clarity of the law, it was incumbent on L to convey to the petitioner that, once apprehended, deportation would be practically inevitable under federal law, which he failed to do.

(*One judge concurring separately*)

Argued April 5—officially released November 14, 2023

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, and tried to the court, *Oliver, J.*; judgment granting the petition, from which the respondent, on the granting of certification, appealed to this court. *Affirmed.*

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, and *Michael Proto* and *Juliana Waltersdorff*, senior assistant state's attorneys, for the appellant (respondent).

*Vishal K. Garg*, assigned counsel, for the appellee (petitioner).

*Opinion*

BEAR, J. After the granting of certification to appeal, the respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting the petition for a writ of habeas corpus filed by the petitioner, Joseph Stephenson. The habeas court found that the petitioner's criminal trial counsel, James Lamontagne, had provided ineffective assistance by failing to properly advise the petitioner about the mandatory deportation consequence of his guilty pleas to two charges of larceny in the sixth degree. On appeal, the respondent claims that the habeas court's determination that Lamontagne had performed deficiently was improper because the court (1) did not determine what advice Lamontagne actually provided, as required by *Budziszewski* v. *Commissioner of Correction*, 322 Conn. 504, 142 A.3d 243 (2016), (2) failed to hold the petitioner to his burden to rebut the presumption that Lamontagne's advice fell within the wide range of reasonable professional assistance, and (3) applied a higher standard than what the law requires when it based its finding of deficient performance on Lamontagne's failure to advise the petitioner that his pleas would " 'automatically subject him to mandatory deportation.' " (Emphasis omitted.) We affirm the judgment of the habeas court.

The following undisputed facts and procedural history were set forth by this court in a previous appeal in this matter. See *Stephenson* v. *Commissioner of Correction*, 197 Conn. App. 172, 174–77, 231 A.3d 210 (2020). "The petitioner is a citizen of Jamaica, which is his country of origin. On or about December 20, 1985, the petitioner was admitted to the United States under nonimmigrant B-2 status. On February 14, 2000, the petitioner's immigration status was changed to that of a lawful permanent resident.

"On March 5, 2013, the petitioner pleaded guilty to a charge of larceny in the sixth degree in violation of General Statutes § 53a-125b in each of two dockets (larceny convictions).[1] On April 9, 2013, the petitioner was sentenced to two concurrent 364 day terms of imprisonment on the larceny convictions.[2] The concurrent 364 day sentences were negotiated by . . . Lamontagne . . . and the prosecutor in an effort by . . . Lamontagne to alleviate any adverse consequences that the petitioner might encounter under federal immigration law as a result of the larceny convictions.

"On July 9, 2013, the United States Department of Homeland Security (department) charged the petitioner 'as removable pursuant to [the Immigration and Nationality Act, 8 U.S.C. § 1227 (a) (2) (A) (ii) (2012)] based on [the] larceny convictions.' Subsequently, on January 21, 2014, the department further charged the petitioner

'as removable pursuant to [8 U.S.C. § 1227 (a) (2) (A) (iii) (2012)], as an aggravated felon' for a prior conviction of robbery in the third degree (robbery conviction).[3] In a decision dated July 22, 2014, the immigration judge concluded that the larceny convictions constituted crimes of moral turpitude under 8 U.S.C. § 1227 (a) (2) (A) (ii), and that the robbery conviction was an aggravated felony under 8 U.S.C. § 1227 (a) (2) (A) (iii). On the basis of these conclusions, the immigration judge ordered that the petitioner be removed from the United States to Jamaica. On December 15, 2014, the Board of Immigration Appeals (board) 'affirm[ed] that the [petitioner] ha[d] been convicted of an aggravated felony for the reasons given in the [i]mmigration [j]udge's decision' and, accordingly, dismissed his appeal. Because the board affirmed the immigration judge's determination that the robbery conviction was an aggravated felony, it concluded that it 'need not address whether the [petitioner] [w]as also . . . convicted of crimes involving moral turpitude.'

"On September 25, 2013, while in custody serving his concurrent 364 day sentences and shortly after the department charged him as removable, the petitioner filed a self-represented petition for a writ of habeas corpus seeking to vacate the larceny convictions.[4] On January 2, 2018, the petitioner, now represented by counsel, filed an amended petition for a writ of habeas corpus (operative petition). In the operative petition, the petitioner alleged that . . . Lamontagne rendered ineffective assistance of counsel. Specifically, the petitioner alleged that . . . Lamontagne's failure to accurately advise him that pleading guilty to the larceny charges against him would make him 'deportable, removable, and inadmissible for reentry under federal immigration law,' constituted deficient performance. The petitioner further alleged that, but for Lamontagne's deficient performance, '[t]here [was] a reasonable probability that . . . [he] would not have entered a guilty plea.'

"On May 22, 2018, a trial on the operative petition was held before the court, *Sferrazza, J.* On May 29, 2018, Judge Sferrazza issued a memorandum of decision in which he held that the operative petition was moot."[5] (Footnotes added; footnotes in original; footnotes omitted.) *Stephenson* v. *Commissioner of Correction*, supra, 197 Conn. App. 174–77. After Judge Sferrazza granted the petition for certification to appeal; id., 177; the petitioner appealed to this court, which concluded that the operative habeas petition was not moot, reversed the habeas court's judgment, and remanded the case for a new habeas trial. Id., 195, 203.

Following remand, a trial date was set for August 4, 2021, but, prior thereto, the parties jointly filed notice that they were resting on the record evidence and represented that they would not be offering further testimony. After briefs were filed and the habeas court

reviewed the exhibits, the transcript of the prior habeas trial that was held on May 22, 2018, and the newly filed briefs, the court ordered supplemental briefing. Specifically, the order stated: " 'This court, from its review, finds that the matter can be completed without prejudice to the parties. By resting on the existing record, the parties have indicated that they see no need to call new witnesses or recall previous witnesses for further testimony. This court does not conclude it necessary to recall any witness whose testimony is material and disputed. Nevertheless, the Appellate Court's decision ordered a new trial and highlighted the need for a habeas court to make "findings with respect to issues that the parties disputed." . . . Additionally, the Appellate Court noted that there were credibility determinations the habeas court needed to resolve on remand. . . . Accordingly . . . the parties [were ordered] to submit simultaneous briefs . . . [that] shall address any concerns the parties have based upon the foregoing, as well as indicate that each party affirmatively and explicitly assents to the court making all necessary findings and assessments from the May 22, 2018 transcript and evidentiary record, and render judgment thereon.' " (Citations omitted.) Subsequently, on February 18, 2022, both parties filed supplemental briefs setting forth their agreement with the remanded claims being adjudicated on the basis of the existing record.

In a memorandum of decision dated April 26, 2022, the habeas court rendered judgment granting the operative habeas petition. In making that decision, the court made a number of factual findings on the basis of the testimony and exhibits submitted at the May 22, 2018 habeas trial. Because the respondent's first claim challenges the sufficiency of those findings, we recount them in detail. Specifically, the court found: "Lamontagne began representing the petitioner in [a case involving a theft at a Costco store (Costco case)] on or about May 27, 2011. The matter was continued several times so the defense could conduct its investigation. On November 21, 2011, the petitioner applied for the psychiatric accelerated rehabilitation diversionary program, which was denied by the court, *Hudock, J.*, on February 6, 2012. After additional continuances, the petitioner appeared on June 26, 2012, in [a case involving a theft at a Stew Leonard's store (Stew Leonard's case)], and . . . Lamontagne was appointed in that case in addition to the Costco case. On February 25, 2013, shortly before jury selection was scheduled to begin on March 5, the petitioner and . . . Lamontagne appeared in court to discuss various pretrial issues.

"On March 5, 2013, the petitioner appeared before the court, *Dennis, J.*, for a change of plea. The petitioner pleaded guilty, in [two separate dockets, to one count of] larceny in the sixth degree in [each] docket. . . . In each of the two dockets, the petitioner pleaded guilty as a persistent larceny offender. The petitioner also

admitted in both cases to being previously convicted of larceny in the sixth degree on December 13, 2007, in Norwalk, as well as of larceny in the fifth degree on January 9, 2004, in Bridgeport. After the prosecutor detailed the supporting facts, the court canvassed the petitioner. The petitioner acknowledged that he had sufficient time to speak with . . . Lamontagne about entering his guilty pleas; he was satisfied with the advice he had received from counsel; no one had threatened or forced or promised him anything into pleading guilty; he was pleading guilty as a persistent larceny offender by acknowledging that he had at least two previous larceny convictions; he knew the maximum penalty for each of the two cases was five years of incarceration; he had discussed with counsel the evidence the state would have [to] present to prove all elements of the offenses; and . . . he understood that if he were not a citizen of the United States, that he could face consequences such as denial of naturalization, deportation or removal from the United States. The court accepted the guilty pleas after finding they were knowing, made with the advice of competent counsel, and factually supported. The court again asked the petitioner if he understood that his convictions could result in his deportation or denial of naturalization if he were not a citizen, and the petitioner answered, '[y]es.' The court stated the terms of the agreed upon sentence that the petitioner would receive, namely, 364 days on each of the two dockets, to run concurrently, for a total effective sentence of 364 days. The matter was continued for sentencing. On April 9, 2013, the court sentenced the petitioner in accordance with the plea agreement. . . .

"Lamontagne, a public defender, testified at the habeas trial about the two criminal cases and his investigation into the charges. In the Costco case, the petitioner was alleged to have placed items inside his jacket and passed all points of sale. A loss prevention officer stopped the petitioner as he was leaving the store. Lamontagne and his investigator went to the Costco store to ascertain the layout of the store. The petitioner indicated that he was not a member of Costco and was going to the customer service desk to inquire about getting a membership when he was stopped by the loss prevention officer. According to the petitioner, he had been cradling the items in his arms and not placing them inside his jacket. There was no video surveillance footage of the petitioner putting any of the items inside his jacket.

"The other offense occurred at a Stew Leonard's convenience store. The petitioner was alleged to have taken several peaches, walked out to his car in the parking lot, and placed the peaches in the car. A customer reported the petitioner to a store employee before he made it to the parking lot. The petitioner told Lamontagne that the car was his brother's and that his brother was there that day. Thus, there was a potential issue

of who put the peaches in the car. . . .

"Lamontagne investigated and considered the potential defenses in both cases. According to Lamontagne, the petitioner was adamant from the outset that he was not guilty in both cases and wanted to proceed to trial. Lamontagne viewed the facts of the Costco case as presenting a viable defense. However, the likelihood of going to trial dropped when the petitioner was charged with the Stew Leonard's case, which Lamontagne assessed as having a weaker defense. The defense strategy then shifted from going to trial to resolving the two cases via a plea agreement. The state had made a plea offer when the petitioner only had the Costco case pending, but the petitioner rejected that first plea offer. The state made a second plea offer after the petitioner was charged in the Stew Leonard's case, which would have resolved both cases, but the petitioner rejected the second plea offer. At a subsequent pretrial, the state made a third plea offer that the petitioner accepted just prior to the beginning of jury selection. . . .

"Lamontagne and the petitioner were aware of the potential immigration consequences resulting from convictions in the two cases. Lamontagne had spoken with an immigration attorney who had indicated certain 'red flags' that the petitioner then sought to avoid. For example, one concern was avoiding a sentence greater than one year to minimize the risk that immigration officials would become aware of the petitioner. Another 'red flag' was having convictions for crimes of moral turpitude. Lamontagne's immigration expert also told him that immigration authorities will automatically look at certain things, such as sentences of one year or more, even if suspended, as well as crimes of moral turpitude. Given the charges in the two criminal cases, the petitioner could not avoid being convicted of larceny, a crime of moral turpitude, but he could attempt to negotiate a sentence of less than one year. . . . Lamontagne worked to try to minimize the potential damage to the petitioner.

"It was . . . Lamontagne's understanding that if a defendant receives a sentence of more than one year, then immigration authorities would automatically initiate deportation proceedings, although those proceedings would not necessarily result in actual deportation. Conversely, it was Lamontagne's understanding that immigration authorities would not automatically initiate deportation proceedings if the sentence were less than one year. Lamontagne advised the petitioner accordingly, and they strove to negotiate a sentence of less than one year to minimize the risk of coming automatically to the attention of immigration authorities. . . .

"Lamontagne understood that the petitioner could be subjected to deportation if convicted of crimes of moral turpitude, but that he would have a 'fighting chance'

because his negotiated sentence was less than one year. Lamontagne discussed with the petitioner the difference between one or two convictions for moral turpitude. The state, however, never gave the petitioner the opportunity to plead guilty in only one case. The plea deal would resolve both cases and automatically result in two separate convictions for larceny, thereby triggering negative immigration consequences. The petitioner's options were to go to trial on both cases or resolve them with guilty pleas to two larceny charges.

"Lamontagne advised the petitioner to speak to his immigration attorney about the difference between one or two convictions for crimes of moral turpitude and about his immigration and deportation issues. The petitioner not only faced immigration and deportation consequences from the Costco and Stew Leonard's cases, but also from the 2009 convictions for robbery in the third degree and two counts of larceny in the fifth degree. According to Lamontagne, who asked the petitioner if he had any prior issues with his immigration status, the petitioner was in the process of appealing [the] 2009 criminal conviction[s], which had independent immigration consequences, when he began representing the petitioner in the Costco case. Because the conviction in the prior case was not final, it was Lamontagne's understanding that the immigration authorities had not commenced any proceedings. Lamontagne became aware that the appeal from the 2009 convictions was unsuccessful before the Costco and Stew Leonard's cases were resolved.

"On cross-examination . . . Lamontagne acknowledged that it was his understanding after speaking to an immigration attorney that the 2009 convictions on appeal would, if ultimately unsuccessful, weigh more heavily on immigration authority decisions than the Costco and Stew Leonard's convictions. The greater weight to be given to the prior convictions directed the focus of the Costco and Stew Leonard's cases onto reducing the sentence below the one year threshold. Lamontagne not only had discussions with the petitioner about the immigration consequences, but also with his family. Lamontagne advised the petitioner and his family that they should speak to an immigration attorney. According to Lamontagne, if he believed that the petitioner did not understand the immigration consequences, then he would not have allowed him to plead guilty unknowingly to such consequences.

"The petitioner testified that he [had] had an immigration proceeding prior to the Costco and Stew Leonard's cases that resulted in a cancellation of a removal order. According to the petitioner, he was not afraid of going to trial on the two new cases because he no longer faced deportation consequences from that prior immigration proceeding. The petitioner viewed a letter submitted by a Macy's department store detective, Donavon Sin-

clair, as helpful in future proceedings. Sinclair's letter, which is undated but apparently produced after his testimony that was critical to the state's case in the jury trial, purported to exonerate the petitioner of the 2006 larceny and robbery charges. See *State* v. *Stephenson*, 131 Conn. App. 510, 27 A.3d 41 (2011), cert. denied, 303 Conn. 92[9], 36 A.3d 240 (2012) . . . . The petitioner maintains to this day that the Sinclair letter demonstrates his innocence in the 2006 case.

"The petitioner was not concerned about immigration consequences at the beginning of the Costco and Stew Leonard's cases because he had recently won his immigration case in 2010. According to the petitioner, he did not become concerned about immigration consequences until the state threatened to call immigration authorities if he went to trial. The petitioner was concerned about the immigration consequences should he receive a sentence of a year or more, and that concern impacted his decision to accept the plea agreement resulting in a 364 day sentence for both cases. The petitioner maintained that Lamontagne never advised him that immigration consequences would be triggered by having two convictions for crimes of moral turpitude. However, the petitioner testified that 'from what we knew and we discussed at that time, if I only had one conviction, there would be no mandatory detention. I didn't know that at the time that if you have two convictions, it's a mandatory . . . detention in immigration.' . . .

"Consequently, the petitioner did not anticipate that he would face mandatory removal based on the dual larceny convictions since the sentences were under one year and, therefore, did not qualify as felonies. The court's plea canvass, however, specifically identified the two charges as felonies. The petitioner acknowledged explicitly during the canvass that he understood that he was pleading guilty to two felony charges. The petitioner indicated that he would not have pleaded guilty if he knew that he would be subjected to mandatory deportation. The petitioner's concern about deportation was corroborated by Tonya Warycha, who provided counseling services to him from 2011 until 2013, [and] testified that he was consistently very worried and stressed about being deported during that time period.

"Attorney Renee Redman, who has extensive experience and specializes in immigration law, regularly consults with defense counsel about the immigration consequences of criminal convictions. Prior to testifying . . . Redman reviewed the petitioner's immigration files, including the 2009–2010 immigration proceeding; the decision and order by immigration Judge Straus on July 22, 2014, which found the petitioner was deportable and ordered his removal from the United States; the decision by the [b]oard . . . upholding the order of removal; and the plea transcript in the present underly-

ing criminal cases. . . . Redman noted that the petitioner's convictions for the Costco and Stew Leonard's cases are for crimes of moral turpitude. Because there are two such convictions not arising out of the same scheme of conduct, and the petitioner was a lawful permanent resident at the time, he was deportable for these two convictions regardless of the sentence length. There are defenses that can be asserted in removal proceedings; however, because the petitioner had been granted cancellation of removal previously, he could not again be granted cancellation of removal because it can only be granted once.

"According to . . . Redman, receiving a sentence of less than one year has no effect on immigration officials becoming aware of a potential deportee. Immigration authorities, in Redman's experience, will become aware of anyone incarcerated [for] any term of incarceration through access to criminal databases. The petitioner could have avoided deportation consequences for the Costco and Stew Leonard's cases if he had pleaded guilty to one of the larcenies, received a sentence of 364 days, and the second larceny [was] nolled or dismissed. However, the state's plea offers never encompassed less than the petitioner pleading guilty to two larcenies [that] did not arise from the same scheme of conduct.

"The respondent called . . . Lamontagne as a rebuttal witness. Lamontagne indicated that he did not tell the petitioner that he would be deported as a result of the two larceny convictions, but that he told him that he was exposed to deportation. The petitioner, therefore, knew that these convictions made him removable. Lamontagne reiterated that he told the petitioner that he should contact his immigration attorney for additional details." (Citations omitted; footnote omitted.)

On the basis of these findings, the court determined that Lamontagne performed deficiently "by failing to properly advise the petitioner about the automatic deportation consequences associated with two crimes of moral turpitude, irrespective of the sentence imposed." The court further determined that, "[b]ut for that deficient advice, the petitioner would not have pleaded guilty and [would have] proceeded to trial."[6] Accordingly, the court granted the operative petition and, thereafter, granted the respondent's petition for certification to appeal. Additional facts and procedural history will be set forth as necessary.

Before we address the merits of the respondent's claims on appeal, we first set forth our well settled standard of review governing habeas matters and claims of ineffective assistance of counsel, as well as relevant legal principles. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right

to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, 215 Conn. App. 322, 348, 282 A.3d 983, cert. denied, 345 Conn. 967, 285 A.3d 736 (2022). "[A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . A reviewing court ordinarily will afford deference to those credibility determinations made by the habeas court on the basis of [the] firsthand observation of [a witness'] conduct, demeanor and attitude." (Internal quotation marks omitted.) *Noze* v. *Commissioner of Correction*, 177 Conn. App. 874, 885–86, 173 A.3d 525 (2017); see also *Heywood* v. *Commissioner of Correction*, 211 Conn. App. 102, 116, 271 A.3d 1086 ("The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . A pure credibility determination made by a habeas court is unassailable." (Citation omitted; internal quotation marks omitted.)), cert. denied, 343 Conn. 914, 274 A.3d 866 (2022).

"The sixth amendment to the United States constitution guarantees a criminal defendant the assistance of counsel for his defense. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, supra, 215 Conn. App. 349. "[I]n order to determine whether the petitioner has demonstrated ineffective assistance of counsel [when the conviction resulted from a guilty plea], we apply the two part test annunciated by the United States Supreme Court in *Strickland* [v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] and *Hill* [v. *Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)]. . . . In *Strickland*, which applies to claims of ineffective assistance during criminal proceedings generally, the United States Supreme Court determined that the claim must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense because there was reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance . . . .

"To satisfy the performance prong under *Strickland-Hill*, the petitioner must show that counsel's representation fell below an objective standard of reasonableness . . . . To satisfy the prejudice prong [under *Strickland-Hill*], the petitioner must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (Internal quotation marks omitted.) *Humble* v. *Commissioner of Correction*, 180 Conn. App. 697, 704–705, 184 A.3d 804, cert. denied, 330 Conn. 939, 195

A.3d 692 (2018). "Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against the petitioner on either ground." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, supra, 349.

When a petitioner who faces mandatory deportation as a consequence of his guilty plea raises a claim of ineffective assistance of counsel, we analyze the claim more particularly under *Padilla* v. *Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). See *Echeverria* v. *Commissioner of Correction*, 193 Conn. App. 1, 10, 218 A.3d 1116, cert. denied, 333 Conn. 947, 219 A.3d 376 (2019). In *Padilla*, "the United States Supreme Court concluded that the federal constitution's guarantee of effective assistance of counsel requires defense counsel to accurately advise a noncitizen client of the immigration consequences of a guilty plea." *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 511. Specifically, the court in *Padilla* explained: "Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear." (Footnote omitted.) *Padilla* v. *Kentucky*, supra, 369. In *Padilla*, "the terms of the relevant immigration statute [were] succinct, clear, and explicit in defining . . . removal," and the court concluded that "counsel could have easily determined that [the petitioner's] plea would make him eligible for deportation simply from reading the text of the statute . . . ." Id., 368. Instead, the petitioner's counsel in *Padilla* performed deficiently by "provid[ing] [the petitioner with] false assurance that his conviction would not result in his removal from this country." Id.

Our Supreme Court recently analyzed *Padilla* in *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 506. In determining "what advice criminal defense counsel must give to a noncitizen client who is considering pleading guilty to a crime when federal law prescribes deportation as the consequence for a conviction"; id.; the court in *Budziszewski* explained: "For crimes designated as aggravated felonies . . . [for which] federal law mandates deportation almost without exception . . . *Padilla* requires counsel to inform the client about the deportation consequences prescribed by federal law. . . . Because noncitizen cli-

ents will have different understandings of legal concepts and the English language, there are no precise terms or one-size-fits-all phrases that counsel must use to convey this message. Rather, courts reviewing a claim that counsel did not comply with *Padilla* must carefully examine all of the advice given and the language actually used by counsel to ensure that counsel explained the consequences set out in federal law accurately and in terms the client could understand. In circumstances when federal law mandates deportation and the client is not eligible for relief under an exception to that command, counsel must unequivocally convey to the client that federal law mandates deportation as the consequence of pleading guilty." (Citations omitted.) Id., 507.

The petitioner in *Budziszewski*, a Polish national who emigrated to the United States and later became a lawful permanent resident, filed a petition for a writ of habeas corpus, claiming that his trial counsel provided ineffective assistance by failing to advise him of the immigration consequences of his guilty plea to an aggravated felony. Id., 508–509. The habeas court granted the habeas petition, concluding that, because "the legal consequences faced by the petitioner were clear, and federal law mandated deportation"; id., 512; the petitioner's trial counsel "was required to inform the petitioner that his plea of guilty to an aggravated felony made him 'subject to mandatory deportation . . . .' " Id., 510. The court in *Budziszewski* "emphasize[d] that there are no fixed words or phrases that counsel must use to convey [the] information, and courts reviewing *Padilla* claims must look to the totality of counsel's advice, and the language counsel actually used, to ensure that counsel accurately conveyed the severity of the consequences under federal law to the client in terms the client could understand. . . . [T]he focus of the court's inquiry must be on the essence of the information conveyed to the client to ensure that counsel clearly and accurately informed the client of the immigration consequences under federal law . . . . This requires the court to consider the totality of the advice given by counsel, make findings about what counsel actually told the client, and then determine whether, based on those findings, the petitioner met his burden to prove that counsel's advice failed to convey the information required under *Padilla*." (Citations omitted.) Id., 512–14.

Moreover, there was evidence in *Budziszewski* that the advice given by the petitioner's counsel may have "[cast] doubt on the likelihood that federal authorities would actually apprehend and deport the petitioner despite the clarity of the law, and the parties disagree[d] whether giving [that] type of advice violates *Padilla*." Id., 514. The court in *Budziszewski*, thus, also considered "whether, in addition to advising the client what federal law *mandates*, *Padilla* requires counsel to also

advise a client of the actual likelihood that immigration authorities will *enforce* that mandate"; (emphasis in original) id., 507; and "the impact of any advice about the likelihood of enforcement advice on counsel's duty under *Padilla*." Id., 514. In addressing those issues, the court stated: "Given the difficulty in predicting enforcement practices, counsel is not required to provide the client with predictions about whether or when federal authorities will apprehend the client and initiate deportation proceedings. Nevertheless, if counsel chooses to give advice or if the client inquires about federal enforcement practices, counsel must still impress upon the client that once federal authorities apprehend the client, deportation will be practically inevitable under federal law." Id., 515.

In summary, the conclusions of the court in *Budziszewski* resulted "in a two step inquiry for a court reviewing a claim that counsel's erroneous enforcement advice violated *Padilla*. First, the court must determine whether counsel complied with *Padilla* by explaining to the client the deportation consequences set forth in federal law. The advice must be accurate, and it must be given in terms the client could comprehend. If the petitioner proves that counsel did not meet these standards, then counsel's advice may be deemed deficient under *Padilla*. If counsel gave the advice required under *Padilla*, but also expressed doubt about the likelihood of enforcement, the court must also look to the totality of the immigration advice given by counsel to determine whether counsel's enforcement advice effectively negated the import of counsel's advice required under *Padilla* about the meaning of federal law." Id., 515–16. Because the habeas court in *Budziszewski* made no findings of fact regarding the content of the advice given by the petitioner's trial counsel, and the court did not indicate which parts, if any, of the testimony given by the petitioner and his trial counsel the court credited, the matter was remanded for a new habeas trial. Id., 510, 518.

With these principles in mind, we turn to the respondent's claims on appeal.

I

The respondent's first claim is that the habeas court improperly found that Lamontagne performed deficiently and that it reached such a conclusion, without making findings, as required by *Budziszewski*, as to the specific advice provided by Lamontagne. We are not persuaded.

In support of this claim, the respondent directs our attention to the habeas court's memorandum of decision in which the court stated that "Lamontagne was aware that convictions for crimes of moral turpitude would subject the petitioner to deportation and even discussed with him the difference between one or two

convictions, *although the specifics of such a discussion are unclear from the testimony*." (Emphasis added.)

To reiterate, under the guidance set forth by our Supreme Court in *Budziszewski*, we, as a court reviewing a claim that counsel's advice violated *Padilla*, must engage in a two step inquiry: first, we must determine whether Lamontagne gave the petitioner accurate advice regarding the deportation consequences set forth in federal law, in terms that the petitioner could understand, and, second, if Lamontagne gave the advice required by *Padilla* but also expressed doubt about the likelihood of enforcement, we must look to the totality of the immigration advice given to determine whether Lamontagne's enforcement advice effectively negated the advice required under *Padilla* about the meaning of federal law. See *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 515–16.

Lamontagne's testimony at the habeas trial sheds light on the court's statement that the record was unclear as to what Lamontagne specifically told the petitioner regarding the difference between one and two convictions of crimes of moral turpitude. In his testimony, Lamontagne acknowledged that larceny is considered a crime of moral turpitude and explained his reasoning for negotiating the 364 day sentences in the plea deal, namely, that he was trying to avoid having the petitioner come to the automatic attention of immigration authorities. As Lamontagne explained, he had consulted with an immigration expert,[7] who told him that immigration authorities automatically "look at" certain things, including, for example, a sentence of one year or more, as well as the commission of crimes of moral turpitude. On the basis of that advice, Lamontagne understood that, if the petitioner received a sentence of one year or more, immigration authorities would initiate deportation proceedings, but that it was not automatic if the petitioner received a sentence of less than one year. When asked if he had given the petitioner "*any other advice* about immigration consequences . . . [i]n addition to the advice about the one year sentence," Lamontagne responded, "[*n*]*ot that I can recall*." (Emphasis added.)

On direct examination of Lamontagne by the petitioner's habeas counsel, the following relevant colloquy took place:

"Q. Okay. And you mentioned something about moral turpitude and convictions for moral turpitude earlier. Can you explain that in a little bit more detail?

"A. My understanding—immigration looks at certain things and what they consider crimes of moral turpitude; what they believe crimes that tend to show a person would act—I guess, more likely to act in an immoral way was something that red-flagged them. Stuff like forgeries, identity theft, larcenies. Things that

show people behaving in rather discrete criminal manners.

"Q. And what was your understanding of the specific immigration consequences about—or, actually, withdrawn. So, it was your understanding that larceny was a crime involving moral turpitude?

"A. That is my understanding. Yes.

"Q. And what was your understanding of the specific immigration consequences that [the petitioner] would face if he accepted the plea agreement in this case?

"A. Just—he would still be subject to deportation because of the crimes of moral turpitude but that he would at least have a fighting chance, so to speak, because that's sort of the only strike against him.

"Q. Okay.

"A. That was the best we were going to be able to get—work out on this particular deal.

"Q. All right. Did you ever talk to him about whether there was a difference between one conviction for a moral turpitude crime and two convictions for a moral turpitude crime?

"A. We did discuss that. Yes.

"Q. And what was your advice to him then?

"A. At that point, you know, we weren't given the opportunity to plead to just one. It was a package deal that the prosecutor was refusing to come off of both charges. So, it was either take the deal or go to trial on both of them.

"Q. Okay. And *did you ever tell* . . . [*the petitioner*] *about what the immigration consequences would be if he had only been convicted of one crime involving moral turpitude*?

"A. *I don't recall telling him that* because I'm not an immigration attorney . . . ." (Emphasis added.)

Thus, as the transcript shows, when asked what specific advice he had given to the petitioner regarding the difference between one and two convictions of crimes of moral turpitude, Lamontagne did not provide an answer that was responsive to the court's inquiry. He did, however, subsequently acknowledge that he could not recall telling the petitioner about the immigration consequences of having only one conviction of a crime of moral turpitude.[8] He also testified that he could not recall giving the petitioner advice about the immigration consequences of his plea deal beyond the advice given concerning the one year sentence. It is also apparent from Lamontagne's testimony that he did not have a correct understanding of the immigration law governing the petitioner's situation. Despite acknowledging that the crimes for which the petitioner was pleading guilty were crimes of moral turpitude and suggesting that he

did discuss with the petitioner the difference between having one or two convictions for such crimes, he nevertheless pursued the 364 day sentences because he was under the mistaken belief that they would give the petitioner a "fighting chance" of avoiding automatic deportation proceedings, and he so advised the petitioner.

Although the respondent places much weight on the court's statement that the specific details of one conversation between the petitioner and Lamontagne were unclear, the respondent, by narrowly focusing on that one statement of the court, ignores the numerous other findings set forth by the court in its memorandum of decision. For example, the court specifically found that "Lamontagne's assessment that sentences lower than one year would help protect the petitioner from immigration consequences was clearly erroneous."[9] In other words, Lamontagne did not provide accurate advice. In making that finding, the court explained that "[i]t was . . . Lamontagne's understanding that if a defendant receives a sentence of more than one year, then immigration authorities would automatically initiate deportation proceedings, although those proceedings would not necessarily result in actual deportation. Conversely, it was Lamontagne's understanding that immigration authorities would not automatically initiate deportation proceedings if the sentence were less than one year. Lamontagne advised the petitioner accordingly and they strove to negotiate a sentence of less than one year to minimize the risk of coming automatically to the attention of immigration authorities."

Redman's testimony demonstrates the inaccuracy of such advice. Specifically, Redman testified as to the immigration consequences to the petitioner, as a lawful permanent resident, resulting from his convictions in the Costco and Stew Leonard's cases, stating that the petitioner's two convictions for crimes of moral turpitude in those two cases, which did not arise out of the same scheme of conduct, rendered the petitioner deportable. Redman further testified that, when retail theft is involved, it is presumptively a crime of moral turpitude and that sentence length of less than one year would have "no effect at all" on whether the petitioner would come to the attention of immigration authorities. In Redman's experience, immigration officials will become aware of a potential deportee through their access to criminal databases.

Furthermore, the court found that "Lamontagne indicated that he did not tell the petitioner that he would be deported as a result of the two larceny convictions but, [rather] told him that he was *exposed* to deportation." (Emphasis added.) The court also found that "[t]he automatic deportation consequence[s]" resulting from the petitioner's guilty pleas were "readily apparent" and that "the law is succinct and straightforward." Again, this finding was supported by the testimony of

Redman that the immigration consequences to which she testified were clear from the face of the immigration statutes.[10]

Accordingly, under our two step analysis, we conclude that the habeas court properly determined that Lamontagne performed deficiently by failing to provide the petitioner with accurate advice regarding the immigration consequences of his guilty pleas to two unrelated crimes of moral turpitude. When, as here, "the deportation consequence is truly clear . . . the duty to give correct advice is equally clear"; *Padilla* v. *Kentucky*, supra, 559 U.S. 357; and "counsel must unequivocally convey to the client that federal law mandates deportation as the consequence for pleading guilty." *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 507. The plain language of the applicable federal law provides that "[a]ny alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable." 8 U.S.C. § 1227 (a) (2) (A) (ii) (2012). Lamontagne gave inaccurate advice when he told the petitioner that his guilty pleas would merely expose him to deportation and that immigration authorities would not automatically initiate deportation proceedings if each sentence under the plea agreement was for less than one year. See, e.g., *Miller* v. *Commissioner of Correction*, 176 Conn. App. 616, 635, 170 A.3d 736 (2017) (counsel's advice, which "inaccurately conveyed to the petitioner that he would have some chance of avoiding deportation after pleading guilty," did not meet standard set forth in *Padilla*). Moreover, that inaccurate advice was compounded by Lamontagne's suggestion to the petitioner that he had a "fighting chance" of not coming to the attention of immigration authorities by pleading guilty to the larceny charges in each case and receiving sentences in each matter of 364 days. See, e.g., *Duncan* v. *Commissioner of Correction*, 171 Conn. App. 635, 659, 157 A.3d 1169 (habeas court improperly found that counsel was not deficient when counsel merely warned petitioner of heightened risk of deportation and failed to tell petitioner that he was subject to mandatory deportation under federal law), cert. denied, 325 Conn. 923, 159 A.3d 1172 (2017).

We also are not persuaded that the habeas court's decision fails to comply with the requirement of *Budziszewski* that the court "make findings about what counsel actually told the client, and then determine whether, based on those findings, the petitioner met his burden to prove that counsel's advice failed to convey the information required under *Padilla*." *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 513–14. In *Budziszewski*, the habeas court did not make *any* findings of fact regarding what trial counsel actually said

to the petitioner about the immigration consequences mandated by federal law, and it did not make any findings about whether trial counsel gave any advice about the likelihood of enforcement and, if so, whether such advice negated counsel's advice about the deportation consequences mandated by federal law. Id., 516. Conversely, in the present case, the habeas court discussed at length in its memorandum of decision its findings of fact as to the discussions between the petitioner and Lamontagne and what had transpired prior to the petitioner entering his guilty pleas. The court's determination that Lamontagne performed deficiently was based on its finding that Lamontagne did not advise the petitioner accurately regarding the immigration consequences of his guilty pleas due to his misunderstanding that the length of the petitioner's sentences for his two larceny convictions would have an impact on whether deportation proceedings would be instituted against the petitioner.[11]

## II

The respondent's second claim is that, as a consequence of the court's failure to make the requisite findings under *Budziszewski*, it failed to hold the petitioner to his burden to rebut the presumption that Lamontagne's advice fell within the wide range of reasonable professional assistance. The court, however, specifically found that Lamontagne "discussed with the petitioner the difference between one and two convictions for crimes involving moral turpitude," although the court did not set forth the specific advice given, as it was unclear from the record. Thus, according to the respondent, because we must "indulge a strong presumption" that Lamontagne's "conduct falls within the wide range of reasonable professional assistance"; (internal quotation marks omitted) *Ayuso* v. *Commissioner of Correction*, supra, 215 Conn. App. 349; and, because the petitioner must overcome that presumption, which the respondent claims he failed to do, we must presume that the advice given by counsel regarding the differences between one and two convictions for crimes involving moral turpitude was correct. We are not persuaded.

"It is well established that when analyzing a claim of ineffective assistance, 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' *Strickland* v. *Washington*, supra, 466 U.S. 690." *Sanders* v. *Commissioner of Correction*, 83 Conn. App. 543, 551, 851 A.2d 313, cert. denied, 271 Conn. 914, 859 A.2d 569 (2004). As this court has stated previously, "[w]e . . . are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from coun-

sel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . Similarly, the United States Supreme Court has emphasized that a reviewing court is required not simply to give [counsel] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he or she] did." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, supra, 215 Conn. App. 349–50. "Nowhere is it said, though, that such a presumption is irrebuttable. As with any refutable presumption, the petitioner may rebut the presumption on adequate proof of sufficient facts indicating a less than competent performance by counsel." *Sanders* v. *Commissioner of Correction*, supra, 551; see also *White* v. *Commissioner of Correction*, 145 Conn. App. 834, 841, 77 A.3d 832, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013).

Our review of the record demonstrates that the habeas court was aware of the *Strickland* presumption, which it set forth in its memorandum of decision. The court, having determined that Lamontagne had provided incorrect advice to the petitioner regarding the immigration consequences of his guilty pleas, necessarily determined that either the presumption had been rebutted or that it did not apply. The essence of the respondent's argument is that, because it is unclear exactly what was said to the petitioner in the one particular conversation highlighted by the court, the court should have presumed that Lamontagne gave correct advice.[12] Specifically, the respondent argues that "the habeas court erred when it construed against the respondent the lack of clarity attainable from the evidence regarding what advice Lamontagne actually provided." Under the circumstances of this case, we do not agree. Even though it was unclear from the record what Lamontagne told the petitioner during that one conversation, the record clearly reflects that Lamontagne did not know and failed to advise the petitioner that, as a result of his guilty pleas to two crimes of moral turpitude, which did not arise out of a single scheme of criminal conduct, he was automatically subject to deportation. Because of that lack of knowledge, Lamontagne arranged the plea deal under the mistaken belief that sentences of less than one year would give the petitioner a chance of not coming to the inevitable attention of immigration authorities. He also acknowledged that he did not advise the petitioner concerning the immigration consequences of being convicted of

one crime involving moral turpitude, although he believed that the state did not have a strong case in the Costco case.

Moreover, there is nothing in the record to suggest that the court construed the lack of clarity in that one conversation against the respondent. The court's determination that Lamontagne performed deficiently was based on its finding, which is amply supported by the record, that Lamontagne inaccurately advised the petitioner that sentences of less than one year for his two larceny convictions could help to protect the petitioner from deportation. Despite the clear language of the federal law concerning the immigration consequences for convictions of two crimes of moral turpitude not arising out of a single scheme of criminal conduct, Lamontagne did not so advise the petitioner and justified his failure to do so on the ground that he was not an immigration attorney. In light of the overwhelming evidence, the presumption that counsel did not deficiently perform his obligations to the petitioner clearly had been rebutted. See *Hinton* v. *Alabama*, 571 U.S. 263, 274, 134 S. Ct. 1081, 188 L. Ed. 2d 1 (2014) ("[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*").

In connection with his argument that the court did not hold the petitioner to his burden of rebutting the presumption that Lamontagne did not perform deficiently, the respondent further asserts that Lamontagne cannot be faulted for giving inaccurate advice because Lamontagne received that advice by consulting with an expert on immigration law. Specifically, the respondent argues that, "if Lamontagne advised the petitioner consistently with the guidance that he had received from an immigration consultant . . . that receiving 364 day sentences could reduce the likelihood of the petitioner coming to the attention of immigration authorities, providing such advice was reasonable. An attorney reasonably may rely upon the opinion of an expert, and, after having received an expert's opinion or advice, an attorney is not required to continue searching for other experts who may provide differing opinions." The cases on which the respondent relies for this proposition involve situations in which counsel consulted a medical expert, and it was determined that counsel was entitled to rely on the medical expert's opinion concerning, for example, whether the petitioner suffered from a mental defect or disease; see, e.g., *Santiago* v. *Commissioner of Correction*, 90 Conn. App. 420, 426, 876 A.2d 1277, cert. denied, 275 Conn. 930, 883 A.2d 1246 (2005), cert. denied sub nom. *Santiago* v. *Lantz*, 547 U.S. 1007, 126 S. Ct. 1472, 164 L. Ed. 2d 254 (2006); or in determining whether to present expert testimony. See, e.g., *Brian S.* v. *Commissioner of Correction*, 172 Conn. App. 535, 543–44, 160 A.3d 1110, cert. denied, 326 Conn. 904, 163

A.3d 1204 (2017). The present case involves a significantly different situation in which counsel himself, as an attorney, has a sixth amendment obligation to advise his client accurately regarding the immigration consequences of his guilty plea.

The fact that Lamontagne consulted with an immigration expert, who either gave him incorrect advice or whose advice Lamontagne simply misunderstood, cannot excuse Lamontagne's failure to advise the petitioner accurately regarding the immigration consequences of his guilty pleas, as required under *Padilla*. We are not aware of any exception to the requirement set forth in *Padilla* for such situations. The fact remains that the petitioner was entitled under the sixth amendment to be informed accurately of the immigration consequences of his guilty pleas. Indeed, the United States Supreme Court stated in *Padilla* that it is the responsibility of courts "under the [c]onstitution to ensure that no criminal defendant—whether a citizen or not—is left to the 'mercies of incompetent counsel.' . . . To satisfy this responsibility, we now hold that counsel must inform [his] client whether his plea carries a risk of deportation. Our longstanding [s]ixth [a]mendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less." (Citation omitted.) *Padilla* v. *Kentucky*, supra, 559 U.S. 374. The court was equally clear that "[i]t is quintessentially the duty of counsel to provide [his] client with available advice about an issue like deportation, and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.' " Id., 371. Recognizing the complexities of immigration law, the court in *Padilla* imposed a limited duty on counsel when the deportation consequences of a particular plea are unclear or uncertain. Id., 369. When the deportation consequences are clear, however, as they are in the present case, counsel is obligated to give correct advice. To excuse counsel's failure to do so simply because counsel consulted with an expert in immigration law would undermine the clear requirement of *Padilla*.

The Court of Appeals of Oregon reached a similar decision in *Daramola* v. *State*, 294 Or. App. 455, 430 P.3d 201 (2018), review denied, 364 Or. 723, 440 P.3d 667 (2019), and we find its analysis therein instructive on this issue. *Daramola* involved a claim by a petitioner that his counsel had provided ineffective assistance by failing to give accurate advice regarding the immigration consequences of the petitioner's guilty plea. Id., 457. In rejecting the state's argument that "criminal defense counsel [could not] be found deficient because he referred [the] petitioner to immigration counsel, and 'was entitled to rely on the opinion of experts,' " the Court of Appeals of Oregon stated: "To the extent the state seems to argue that bringing in immigration counsel *per se* renders criminal defense counsel's perfor-

mance constitutionally adequate, the state misunderstands *Padilla*. If criminal defense counsel relies on outside consultation with immigration attorneys in educating herself or himself about immigration consequences, outside immigration counsel functions as a member of the defense team. Consultation with immigration counsel is a tool criminal defense counsel can use, but the involvement of immigration counsel does not obviate defense counsel's [s]ixth [a]mendment obligation to provide constitutionally adequate advice. As *Padilla* held, 'when the deportation consequence is truly clear . . . the duty to give correct advice is equally clear.' . . . The duty is *defense counsel's*." (Citation omitted; emphasis in original.) Id., 464. The court in *Daramola* further explained: "Of all the facets of the legal profession, only the criminal defense attorney is specifically enshrined in the constitution. The adequate and effective representation guaranteed by the [s]ixth and [f]ourteenth [a]mendments fall squarely on the shoulders of criminal defense counsel. As discussed, *Padilla* makes clear that advice of immigration consequences is part of—not collateral to—that [s]ixth [a]mendment guarantee. . . . For the immigrant defendant, immigration consequences are as central to the defense function as case investigation, pretrial suppression, evaluating defenses, and calculating sentence exposure." (Citation omitted.) Id.

For the foregoing reasons, the respondent's second claim fails.

### III

The respondent's final claim is that the habeas court applied a higher standard than what the law requires. Specifically, the respondent argues that, "even if the habeas court's analysis comported with *Budziszewski*'s requirements, the court nevertheless erred by finding that Lamontagne performed deficiently by failing to advise that the petitioner's pleas would '*automatically* subject him to *mandatory* deportation.' . . . *Padilla* and *Budziszewski* do not require an attorney to employ those specific words or language that absolute." (Citations omitted; emphasis in original.) According to the respondent, pursuant to *Padilla* and *Budziszewski,* "an attorney may perform reasonably by advising that a guilty plea will render a client legally deportable, but that other factors may reduce the likelihood that deportation proceedings will in fact occur. Here, the evidence shows that Lamontagne advised the petitioner that his guilty plea would render him deportable, but that there was a chance that immigration authorities would not pursue enforcement if the petitioner received a sentence of less than one year. Under *Padilla* and *Budziszewski*, that advice was reasonable under the petitioner's specific circumstances, and, therefore, the petitioner failed to prove deficient performance." We do not agree.

"[T]he precise advice counsel must give depends on the clarity of the consequences specified by federal immigration law." *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 511. Although the respondent is correct that, pursuant to *Budziszewski*, "there are no precise terms or one-size-fits-all phrases that counsel must use to convey" the deportation consequences prescribed by federal law, *Budziszewski* also makes clear that, "[i]n circumstances when federal law mandates deportation . . . counsel must *unequivocally convey to the client that federal law mandates deportation* as the consequence for pleading guilty." (Emphasis added.) *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 507. As in *Budziszewski*, in the present case, the legal consequences faced by the petitioner were clear and federal law mandated deportation. Having reviewed the habeas court's memorandum of decision as a whole, we are not persuaded that the habeas court deviated from the standard set forth in *Padilla* and *Budziszewski* by requiring the use of specific words or phrases. Rather, it appears that the habeas court focused more broadly on whether Lamontagne correctly conveyed to the petitioner the specific, mandatory deportation consequences of the guilty pleas under federal law when he undercut the certainty of that result with clearly erroneous advice suggesting that deportation might be avoidable. See id., 512–13. The essence of the information conveyed to the petitioner suggested that, given the structure of the sentencing under the plea deal, there was a chance that the petitioner would not be deported, which did not accurately depict the immigration consequences called for with respect to the petitioner's guilty pleas to two separate crimes of moral turpitude. See id., 513. Moreover, to the extent that Lamontagne gave advice "casting doubt on the likelihood that federal authorities would actually apprehend and deport the petitioner despite the clarity of the law"; id., 514; it was incumbent that he convey to the petitioner that, once apprehended, deportation would be "practically inevitable under federal law," which he failed to do.[13] Id., 515.

The judgment is affirmed.

In this opinion SUAREZ, J., concurred.

[1] "The petitioner further pleaded guilty to being a persistent larceny offender under General Statutes § 53a-40." *Stephenson* v. *Commissioner of Correction*, supra, 197 Conn. App. 174 n.2.

General Statutes (Rev. to 2013) § 53a-40 (e) provides that "[a] persistent larceny offender is a person who (1) stands convicted of larceny in the third degree in violation of the provisions of section 53a-124 in effect prior to October 1, 1982, or larceny in the fourth, fifth or sixth degree, and (2) has been, at separate times prior to the commission of the present larceny, twice convicted of the crime of larceny."

General Statutes (Rev. to 2013) § 53a-40 (*l*) provides that, "[w]hen any person has been found to be a persistent larceny offender, the court, in lieu of imposing the sentence authorized by section 53a-36 for the crime of which such person presently stands convicted, may impose the sentence of imprisonment for a class D felony authorized by section 53a-35, if the crime of which such person presently stands convicted was committed prior

to July 1, 1981, or authorized by section 53a-35a, if the crime of which such person presently stands convicted was committed on or after July 1, 1981.''

[2] The petitioner's habeas counsel represented that, as of the date of the original trial on his habeas petition, the petitioner had completed serving his concurrent 364 day sentences. The petitioner's counsel further represented that the petitioner was currently serving sentences for a subsequent conviction of burglary in the third degree, attempt to commit tampering with physical evidence, and attempt to commit arson in the second degree, all of which arose from events occurring in March, 2013. See *State* v. *Stephenson*, 187 Conn. App. 20, 22, 201 A.3d 427 (2019), rev'd, 337 Conn. 643, 255 A.3d 865 (2020). The petitioner received a total effective sentence of twelve years of incarceration followed by eight years of special parole on this conviction. Id., 29. On direct appeal, this court reversed the trial court's judgment of conviction rendered against the petitioner and remanded the case with direction to render a judgment of acquittal on all charges. Id., 22. The state petitioned for certification to appeal from this court's judgment, which our Supreme Court granted in part. *State* v. *Stephenson*, 331 Conn. 914, 204 A.3d 702 (2019). Our Supreme Court thereafter reversed the judgment of this court and remanded the case to this court for further proceedings. *State* v. *Stephenson*, 337 Conn. 643, 654, 255 A.3d 865 (2020). On remand, this court affirmed the judgment of conviction. *State* v. *Stephenson*, 207 Conn. App. 154, 192, 263 A.3d 101 (2021). The petitioner remains incarcerated.

[3] ''In 2010, a judgment of conviction of, inter alia, robbery in the third degree was rendered against the petitioner, which judgment this court affirmed on appeal. *State* v. *Stephenson*, 131 Conn. App. 510, 512–13, 27 A.3d 41 (2011), cert. denied, 303 Conn. 929, 36 A.3d 240 (2012).

''Thereafter, the petitioner brought a habeas action in the United States District Court for the District of Connecticut challenging the robbery conviction. *Stephenson* v. *Connecticut*, United States District Court, Docket No. 3:12CV1233 (RNC) (D. Conn. March 31, 2014). The petitioner raised three claims in his original petition and, subsequently, filed two motions to amend his petition to allege additional claims. Id. The District Court denied the petitioner's motions to amend on the ground that the claims raised therein— ineffective assistance of counsel, improper dismissal of a juror, and actual innocence—were procedurally defaulted. Id. The District Court also denied the petition. Id.

''On appeal, the [United States Court of Appeals for the Second Circuit] 'remanded for a determination of whether the new claims, although procedurally defaulted, can be adjudicated on the merits based on [the] petitioner's claim that he is actually innocent of [the robbery conviction].' *Stephenson* v. *Connecticut*, United States District Court, Docket No. 3:12CV1233 (RNC) (D. Conn. January 8, 2018); see also *Stephenson* v. *Connecticut*, 639 Fed. Appx. 742, 746 (2d Cir. 2016). The District Court, on remand, 'conclude[d] that [the petitioner] ha[d] not met his burden of establishing a credible, compelling claim of actual innocence and therefore dismiss[ed] the petition.' *Stephenson* v. *Connecticut*, supra, United States District Court, Docket No. 3:12CV1233 (RNC). Neither the District Court nor the Second Circuit issued the petitioner a certificate of appealability, and, thus, his appeal from the District Court's judgment was dismissed. See *Stephenson* v. *Connecticut*, United States Court of Appeals, Docket No. 18-367 (2d Cir. February 8, 2019).'' *Stephenson* v. *Commissioner of Correction*, supra, 197 Conn. App. 175–76 n.4.

[4] ''The petitioner did not file a direct appeal from the larceny convictions.'' *Stephenson* v. *Commissioner of Correction*, supra, 197 Conn. App. 176 n.5.

[5] Specifically, ''Judge Sferrazza found that the immigration judge had concluded that the robbery conviction constituted an aggravated felony and had ordered the petitioner's removal, in part, on that basis. Judge Sferrazza found that the petitioner did not challenge the robbery conviction in the operative petition. He further found that, on appeal, the board affirmed both the immigration judge's aggravated felony conclusion and order of removal. Accordingly, Judge Sferrazza concluded that his adjudication of the petitioner's claim 'can provide no practical benefit to [him] because the mandated removal order, affirmed on appeal, is premised on an entirely different conviction for an aggravated felony, apart from [the] larceny convictions' that were challenged in the operative petition. The petitioner filed a petition for certification to appeal, which Judge Sferrazza granted.'' (Footnote omitted.) *Stephenson* v. *Commissioner of Correction*, supra, 197 Conn. App. 177.

[6] We note that the respondent has not challenged the habeas court's prejudice finding on appeal.

[7] Lamontagne could not recall the specific expert with whom he had consulted.

[8] We note that the petitioner testified that Lamontagne never told him that, by entering guilty pleas to the two larceny charges, he would be deported, regardless of the length of the sentences.

[9] In challenging this finding on appeal, the respondent argues that "Lamontagne did not testify that he believed that the 364 day sentences would render the petitioner not deportable. Rather, he testified that he understood that, by pleading guilty to the two larceny counts, the petitioner still would be subject to deportation for having convictions for crimes of moral turpitude, but he would still have a 'fighting chance.' . . . The habeas court apparently did not consider that efforts to avoid having a deportable client come to the attention of immigration authorities, such as by negotiating a sentence of less than one year, could 'help protect' the petitioner from being deported, though he would remain deportable." (Citation omitted.) The testimony before the habeas court from Redman, an immigration expert, however, demonstrates the inaccuracy in the respondent's assertion that Lamontagne's advice concerning the immigration consequences of the sentences of less than one year that were included in the petitioner's plea deal could have given the petitioner a "fighting chance" from being deported. According to Redman, immigration officials would become aware of the petitioner as a result of his incarceration, regardless of its length, through access to criminal databases. Redman also testified that she did not think it was accurate for counsel to advise a defendant pleading guilty to two unrelated crimes of moral turpitude that a sentence of less than one year would have any effect on whether the defendant would come to the attention of immigration authorities. The court reasonably could have credited Redman's testimony in support of its finding that Lamontagne's assessment that two sentences of less than one year would give the petitioner a "fighting chance" to avoid deportation was substantively incorrect.

The respondent also asserts that, "if Lamontagne advised the petitioner that pleading guilty to the two larceny charges would render him deportable for being convicted of crimes of moral turpitude, but that receiving sentences of less than one year would preclude him from also having aggravated felonies on his record and could reduce the likelihood of his convictions coming to the attention of immigration authorities, such advice was reasonable and, indeed, correct." (Emphasis omitted.) This argument is grounded in the fact that, under federal immigration law, an aggravated felony includes "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year . . . ." 8 U.S.C. § 1101 (a) (43) (G) (2012). Moreover, federal law also provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227 (a) (2) (A) (iii) (2012). The problem, however, is that the respondent's claim is based on speculation, as there is nothing in the record, including Lamontagne's testimony, to suggest that he crafted the sentences in the plea deal to avoid the petitioner being convicted of aggravated felonies. Although we recognize that a sentence of less than one year may improve a person's chances of avoiding deportation under certain circumstances, those circumstances were not present here. In the present case, the petitioner entered guilty pleas to two crimes of moral turpitude, not arising out of a single scheme of criminal conduct, without knowing that doing so would automatically render him deportable, and with the belief that doing so would lessen the chance that his convictions would come to the attention of immigration authorities. As Redman testified, under these circumstances, the length of the petitioner's sentences had no impact whatsoever on whether immigration authorities would initiate deportation proceedings. The respondent's argument, therefore, is unavailing.

[10] Notably, on appeal, the respondent has not argued that federal law is unclear on the issue of whether an alien who is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal conduct, is deportable. Instead, in a footnote in his brief, the respondent suggests that it is unclear whether larceny in the sixth degree is a crime of moral turpitude. Specifically, the respondent argues: "Because Lamontagne operated under the belief that the larceny charges were crimes of moral turpitude, the respondent assumes arguendo that he was obligated to advise the petitioner in accordance with that belief. This court, however, has noted that 'the phrase "crime involving moral turpitude" is notoriously baffling' and 'is perhaps the quintessential example of an ambiguous phrase.' *Georges* v. *Commissioner of Correction*, 203 Conn. App. 639, [648–49, 249 A.3d 355, cert. denied, 336 Conn. 943, 250 A.3d 40 (2021)] . . . . The respon-

dent submits that the habeas court's finding that it was 'uncontroverted' that the petitioner's larceny convictions would automatically subject him to mandatory deportation was wide of the mark, in that, absent precedent finding sixth degree larceny a crime of moral turpitude, an attorney reasonably could have found it uncertain whether a conviction therefor would render a client deportable." (Citation omitted.) This claim fails for two reasons. First, Redman testified at the habeas trial that, "when retail theft is involved, it is presumptively a crime involving moral turpitude." That testimony was never challenged through cross-examination, and it was not contradicted by the admission of any other testimony or evidence. Moreover, the evidence before the court also included the 2014 decision of the immigration judge who, after examining relevant immigration law on the subject, concluded that the petitioner had been convicted of two crimes of moral turpitude, not arising out of a single scheme of criminal conduct. Thus, the court's finding in the present case was reasonably based in the evidence and the plain language of the federal law. Moreover, Lamontagne testified that he understood that larceny is a crime of moral turpitude and he never suggested to the habeas court that the petitioner's conviction of larceny in the sixth degree did not constitute a crime of moral turpitude, such that the immigration consequences to the petitioner were unclear or that the petitioner's pleas to the two larceny charges did not render him automatically deportable. Because the claim that larceny in the sixth degree may not constitute a crime involving moral turpitude, thereby rendering the immigration consequences for the petitioner's convictions unclear, was never raised before, brought to the attention of, or addressed by, the habeas court, and because the claim has been raised for the first time on appeal, we decline to address it further. " 'We do not entertain claims not raised before the habeas court but raised for the first time on appeal.' . . . *Lopez* v. *Commissioner of Correction*, 142 Conn. App. 53, 57 n.2, 64 A.3d 334 (2013); see also *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 598, 188 A.3d 702 (2018) (appellate review of claims not raised before habeas court would amount to ambuscade of habeas judge); *Walker* v. *Commissioner of Correction*, 176 Conn. App. 843, 846 n.2, 171 A.3d 525 (2017) (Appellate Court is not compelled to consider issues neither alleged in habeas petition nor considered at habeas proceeding); *Sewell* v. *Commissioner of Correction*, 168 Conn. App. 735, 736–37 n.2, 147 A.3d 196 (2016) (Appellate Court did not consider issues not alleged in habeas petition or considered at trial during habeas proceeding), cert. denied, 324 Conn. 907, 152 A.3d 1245 (2017)." *Coleman* v. *Commissioner of Correction*, 202 Conn. App. 563, 577, 246 A.3d 54, cert. denied, 336 Conn. 922, 246 A.3d 2 (2021).

[11] The respondent further takes issue with the habeas court's statement that "[t]he credible evidence shows that the petitioner did not receive accurate advice about [the immigration consequences of his guilty pleas]." Specifically, the respondent asserts that, because "[t]he court did not identify what credible evidence established that Lamontagne did not provide accurate advice," as a matter of law the court could not have found that the petitioner proved deficient performance under *Budziszewski*. The testimony provided by Lamontagne and Redman, which the court reasonably could have credited, amply supports the court's determination that the petitioner did not receive accurate advice about the automatic deportation consequences of his guilty pleas. Moreover, in its memorandum of decision, the court specifically "credit[ed] the petitioner's testimony that he sought to avoid deportation and that he understood his guilty pleas would not trigger automatic consequences." The petitioner also testified that Lamontagne never told him that, by pleading guilty to the two larceny charges, he would be deported, regardless of the length of his sentences.

[12] Even if we assume that Lamontagne correctly advised the petitioner during that unclear conversation and construe Lamontagne's advice concerning the 364 day sentences as advice regarding enforcement, we conclude that the result would remain the same, as Lamontagne's suggestion to the petitioner that the plea deal gave him a "fighting chance" of avoiding the detection of immigration authorities effectively negated any correct advice he may have given regarding the requirements of federal law for a person convicted of two unrelated crimes of moral turpitude. See *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 515–16.

[13] The respondent argues in his principal appellate brief that "*Padilla* does not require an attorney to advise that deportation will be 'automatic' or 'mandatory' as a consequence of a plea. Rather, so long as counsel advises that the plea will make the client deportable but that the client may escape enforcement, counsel performs reasonably." The respondent further argues

in his appellate reply brief that Lamontagne's "advice regarding the likelihood of enforcement did not negate advice that pleading guilty would render the petitioner deportable because, regardless of whether authorities pursued enforcement, the petitioner would remain deportable." We disagree with both arguments. As we stated previously in this opinion, our Supreme Court explained in *Budziszewski* that, although counsel is not required to provide advice regarding the likelihood of enforcement, when counsel chooses to do so, "counsel must still impress upon the client that once federal authorities apprehend the client, deportation will be practically inevitable under federal law." *Budziszewski* v. *Commissioner of Correction*, supra, 322 Conn. 515. Additionally, when counsel gives advice expressing doubt about the likelihood of enforcement, courts must "look to the totality of the immigration advice given by counsel to determine whether counsel's enforcement advice effectively negated the import of counsel's advice required by *Padilla* about the meaning of federal law." Id., 516. It necessarily follows that counsel cannot advise a client that a guilty plea will subject the client to mandatory deportation and then suggest to the client that there is nothing to worry about because enforcement will be unlikely. Such an advisement would run counter to the safeguards set in place by *Padilla* and *Budziszewski*.

———————————————